**DUDMAN COMMUNICATIONS CORPORATION, Appellant,**

v.

**DEPARTMENT OF the AIR FORCE.**

**No. 86–5154.**

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 21, 1986.

Decided April 14, 1987.

Patti A. Goldman, with whom Alan B. Morrison, Eric R. Glitzenstein and Reuben B. Robertson, III, Washington, D.C., were on the brief, for appellant.

Mark E. Nagle, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before MIKVA, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

MIKVA, Circuit Judge:

Appellant Dudman Communications Corporation, a radio broadcaster, invoked the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to obtain a preliminary draft of a historical work prepared and published by the Department of the Air Force. After the Department denied the FOIA request, Dudman brought suit in district court. The court held that the draft was exempt from FOIA's general disclosure requirements because release of the draft would reveal the Department's deliberative process. We affirm.

## I. BACKGROUND

The Department of the Air Force maintains an Office of Air Force History (OAFH), one of whose functions is to commission, edit, and publish historical works concerning the Air Force and its operations. OAFH intends these works to assist Air Force decisionmakers; according to the Chief of OAFH, "[t]he primary considerations are that [the historical works] have utility for direct mission support purposes and serve as guides for Air Force action, that they be of current and future value to the Air Force in planning and decision making, and that they be a source of essential and accurate information." In order to advance these objectives, OAFH maintains a multi-tiered system of editorial review. Once the historian assigned to a project has produced a draft, senior OAFH officers scrutinize and edit it. After these officers have approved an edited manuscript, they submit it to the agencies within the Air Force that have special knowledge of the work's subject matter. These agencies critique the draft and direct the author to make various changes. The manuscript is then forwarded to the Director of the Office of Public Affairs, who decides whether the work is suitable for publication. If the Director approves the work, the manuscript returns to OAFH for final editorial review and final approval by the Chief of OAFH. Approval at this stage results in publication.

In the early 1970s, OAFH decided to publish a history of the role of the Air Force in South Vietnam between 1961 and 1964. The Air Force assigned Riley Sunderland, a historian employed by the Air Force, to write the history, and he produced a working draft. At the first stage of

editorial review, however, OAFH officers concluded that the draft fell short of acceptable standards and removed Sunderland from the project. OAFH officers earlier had aborted another historian's draft manuscript concerning a similar topic. When Sunderland's work proved unsatisfactory, OAFH decided to ask yet another historian, Martin Blumenson, to rework the two preliminary drafts into a single publishable product. Blumenson performed this task, and the Air Force published Blumenson's manuscript after subjecting it to the many levels of editorial review.

In January of 1982, Dudman requested access to Sunderland's draft manuscript under FOIA. Dudman's desire to review the manuscript apparently sprang from a belief that the manuscript contained information about an unreported war crime. The Air Force denied Dudman's request, claiming that the draft fell within Exemption 5 to FOIA's general disclosure requirements because release of the draft would reveal the Air Force's deliberative process. Dudman subsequently brought suit challenging the Air Force's decision.

The parties soon entered into negotiations in an effort to reach a settlement. Dudman presented a narrowed request to the Air Force, seeking only the portions of Sunderland's manuscript that related to the following subjects: (1) an investigation by Brigadier General Rollen Anthis of an alleged war crime involving the death of a non-combatant; (2) the conversion of trainer airplanes for use as fighter-bombers; and (3) a discussion about the role of the Air Force in South Vietnam between Secretary of Defense Robert McNamara and the Commander-in-Chief, Pacific Air Forces. In response to this narrowed request, the Air Force released ten pages of Sunderland's manuscript. Dudman believed, however, that the Air Force had withheld other pages of the manuscript responsive to the narrowed request. Dissatisfied with the outcome of the settlement efforts, Dudman decided to pursue its claim for the entire manuscript.

On the Air Force's motion for summary judgment, the district court dismissed Dudman's suit. The court first stated that it had reviewed Sunderland's manuscript *in camera* in an effort to advance settlement by identifying further references to the subjects listed in Dudman's narrowed request, but had found no additional responsive material. The court then turned to consider the merits of Dudman's claim for the entire manuscript. In this portion of the memorandum opinion, the court held that the draft fell within Exemption 5 to FOIA's mandatory disclosure provisions because release of the draft would reveal the government's deliberative process. In reaching this decision, the court relied heavily on *Russell v. Department of the Air Force*, 682 F.2d 1045 (D.C.Cir.1982), in which a panel of this circuit held a similar draft document exempt from FOIA's general disclosure requirements.

## II. DISCUSSION

Exemption 5 of FOIA provides that an agency need not disclose "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Congress enacted this exemption to ensure that agencies "not lose the protection traditionally afforded through the evidentiary privileges simply because of the passage of the FOIA." *Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 862 (D.C.Cir.1980). Among the privileges protected by Exemption 5 is the "deliberative process" privilege. This privilege, which protects the deliberative and decisionmaking processes of the executive branch, rests most fundamentally on the belief that were agencies forced to "operate in a fishbowl," S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965), the frank exchange of ideas and opinions would cease and the quality of administrative decisions would consequently suffer.

The first courts that considered the deliberative process aspect of Exemption 5 drew a distinction between "factual" material and "deliberative" material, the latter consisting primarily of governmental officials' opinions and recommendations on

matters of executive policy. *See, e.g., Environmental Protection Agency v. Mink,* 410 U.S. 73, 87–89, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973); *Bristol-Myers Co. v. Federal Trade Commission,* 424 F.2d 935, 939 (D.C.Cir.), *cert. denied,* 400 U.S. 824, 91 S.Ct. 46, 27 L.Ed.2d 52 (1970). Under this scheme, agencies could withhold deliberative material, but could not withhold factual material. The release of factual material, these courts reasoned, would not be " 'injurious to the consultative functions of government that the privilege of non-disclosure protects.' " *Mink,* 410 U.S. at 87, 93 S.Ct. at 836 (quoting *Kaiser Aluminum & Chemical Corp. v. United States,* 157 F.Supp. 939, 946, 141 Ct.Cl. 38 (1958)).

Courts soon came to realize, however, that use of the factual matter/deliberative matter distinction produced incorrect outcomes in a small number of cases. *See Lead Industries Association v. Occupational Safety and Health Administration,* 610 F.2d 70, 86 (2nd Cir.1979) (Friendly, J.); *Mead Data Central, Inc. v. United States Department of the Air Force,* 566 F.2d 242, 256 & n. 40 (D.C.Cir.1977); *Montrose Chemical Corp. v. Train,* 491 F.2d 63, 67–68 (D.C.Cir.1974). Congress enacted Exemption 5 to protect the executive's deliberative processes—not to protect specific materials. Although courts focusing merely on the nature of the material sought will usually act consistently with the congressional purpose, they will in some instances reach plainly inappropriate results. The release of materials plausibly labeled "deliberative" will occasionally reveal nothing about an agency's decisionmaking process. *See Mead Data,* 566 F.2d at 256 n. 40 (citing *Vaughn v. Rosen,* 523 F.2d 1136, 1145 (D.C.Cir.1975); *Moore-McCormack Lines, Inc. v. I.T.O. Corp.,* 508 F.2d 945, 948 (4th Cir.1974)). Conversely, the release of materials plausibly labeled "factual" will occasionally reveal much about that process. *See Lead Industries,* 610 F.2d at 86; *Montrose Chemical,* 491 F.2d at 67–68. Courts therefore began to focus less on the nature of the materials sought and more on the effect of the materials' release: the key question in Exemption 5 cases became whether the disclosure of materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.

In 1982, in *Russell v. Department of the Air Force,* this court followed the above approach and found that a document remarkably similar to the document at issue in this case fell within Exemption 5. The plaintiffs in *Russell* had requested a draft manuscript of an official Air Force history entitled "Operation Ranchhand: The United States Air Force and Herbicides in Southeast Asia, 1961–71." The draft at issue differed from a manuscript that the Air Force had released to the public in only one respect: the draft contained twenty pages of purely factual material that OAFH officers had decided to delete. The court held that release of this draft "would reveal the type of deliberative process that Exemption [5] was designed to protect." 682 F.2d at 1048. The court noted that a simple comparison of the draft with the final manuscript would expose an editorial judgment made by Air Force personnel— *i.e.,* that the factual matter contained in the deleted segment was unimportant or otherwise inappropriate for publication. *See id.* at 1048–49. The *Russell* court stated that exposure of such an editorial judgment would inhibit " 'creative debate and candid consideration of alternatives' " within the Air Force. *Id.* at 1048 (quoting *Jordan v. United States Department of Justice,* 591 F.2d 753, 772 (D.C.Cir.1978)). The court reasoned that if an OAFH historian is put on notice that each change in his manuscript will be subject to public scrutiny, "with possible adverse consequences to the Air Force," he will likely draft his history to conform to what he perceives to be the priorities and views of his senior editors. *Id.* The court therefore approved the Air Force's decision not to disclose the draft manuscript.

Dudman argues that the case at bar differs significantly from *Russell.* According to Dudman, disclosure of Sunderland's draft would not reveal the kinds of editorial decisions that the *Russell* court sought to

protect. Dudman focuses on the many stages of revision and review that occurred between the completion of Sunderland's draft and the publication of the final history. First, Blumenson substantially reworked Sunderland's draft and combined it with another work. Next, Air Force personnel subjected the Blumenson manuscript to the usual multi-tiered editorial process. Dudman argues that given the evolution of the work, a comparison of Sunderland's draft with the published manuscript would not reveal any specific editorial decisions. Whereas a comparison of the draft and the final manuscript in *Russell* would have indicated that senior officials made a decision at a single stage in the editorial process to delete twenty pages of factual material, a comparison of the two manuscripts in this case would reveal only that various persons made various alterations at various stages of the process. In short, Dudman claims that the "Sunderland manuscript is simply too far removed from the ... final work to provide any insight into ... agency deliberations." Reply Brief of Appellant at 3.

We reject this argument. We cannot deny that a person comparing Sunderland's draft with the final manuscript would confront a wealth of changes and would have no way to ascribe a given change to a particular person or editorial stage. But we think this point of little significance: the rationale of *Russell* still applies. As we have noted, the *Russell* court reasoned that the disclosure of editorial judgments—for example, decisions to insert or delete material or to change a draft's focus or emphasis—would stifle the creative thinking and candid exchange of ideas necessary to produce good historical work. *Russell* stated that an author would hesitate to advance unorthodox approaches if he knew that the Department's rejection of an approach could become public knowledge. We think equally likely that in these circumstances, editors would place pressure on authors to write drafts that carefully toe the party line. These risks are present even when the public cannot segregate and specifically identify editorial changes. The danger of "chilling" arises from disclosure that the Air Force as an institution made changes in a draft at some point—not from disclosure that particular Air Force employees at particular stages in the editorial process made such changes. Release of Sunderland's manuscript would disclose the alterations that the Air Force, in its entirety, made during the process of compiling the official history. We therefore think that the draft manuscript in this case falls within Exemption 5 as clearly as did the draft in *Russell.*

Dudman argues that this holding will allow agencies to hide all manner of factual information from public view. An agency, Dudman claims, will need only to place factual information within draft documents in order to ensure that no member of the public can gain access to it. Thus, Dudman claims, our holding will give agencies full control over what information will be made publicly available.

Our holding, however, can have no such effect. If a person requests particular factual material—*e.g.*, material relating to an investigation of a war crime—an agency cannot withhold the material merely by stating that it is in a draft document. In such a case, the agency will usually be able to excise the material from the draft document and disguise the material's source, and thus the agency will usually be able to release the material without disclosing any deliberative process. When the agency can take such steps, it may not withhold the information under Exemption 5. The exemption plainly applies in this case because Dudman asked not for particular factual material, but for the draft in which Dudman thought the material could be found. We therefore think that Dudman mistakes the potential consequences of our holding.

For the reasons stated, we affirm the decision of the district court that the Air Force was entitled to withhold the draft manuscript that Dudman requested.

*It is so ordered.*