PETROLEUM INFORMATION
CORPORATION

v.

UNITED STATES DEPARTMENT OF
THE INTERIOR, Appellant.

No. 91–5059.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 16, 1992.

Decided Oct. 27, 1992.

As Amended Oct. 27, 1992.

Matthew M. Collette, Attorney, Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., and Leonard Schaitman, Attorney, Dept. of Justice, Washington, D.C., were on the brief, for appellant.

Ronald L. Plesser, with whom Emilio W. Cividanes, Washington, D.C., was on the brief, for appellee.

Before: MIKVA, Chief Judge; EDWARDS and RUTH BADER GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Petroleum Information Corporation submitted a Freedom of Information Act (FOIA) request to the Bureau of Land Management, seeking access to records from a computer data bank containing information on public lands. The data bank, called the Legal Land Description (LLD) file, will be a component of a comprehensive new land records system the Bureau is developing. The Bureau resisted disclosure, arguing that the LLD file is an unfinished "draft" protected by the FOIA's deliberative process privilege. *See* 5 U.S.C. § 552(b)(5) (1988) (Exemption 5). The district court granted summary judgment for Petroleum Information. In accord with the district court, we conclude that the LLD information requested is not shielded by the deliberative process privilege. We therefore affirm the district court's judgment.

## I. BACKGROUND

The Bureau of Land Management (Bureau or BLM), a constituent of defendant-appellant Department of the Interior, manages more than 340 million acres of federally-owned lands and 750 million acres of federal mineral holdings. BLM also maintains over one billion paper documents concerning these properties. The Bureau relies on a number of different record-keeping systems in its efforts to maintain complete and accurate information on public lands. The "Master Title Plat" system, for example, is a set of manually prepared maps that depict land ownership and uses within a township. The "Historical Index" is a chronological list of land transactions in a given township. The Bureau now operates two computerized data bases: the Mining Claims Recordation System (MCRS), which records and tracks mining claims and assessments, and the Case Recordation System (CRS), which records and tracks oil and gas leases. Under the current record-keeping arrangements, government officials or private persons who seek full information concerning a particular tract of land may have to examine several sources, including in some cases the original hand-drawn patent.

The Bureau has long recognized that its decentralized record-keeping systems are outdated, sometimes inaccurate, and cumbersome for both the government and the general public to use. In 1982, BLM announced plans for a new system that would integrate information from the diverse paper and electronic sources into a single easy-to-use format. The planned data bank is called the Automated Land and Mineral Record System (ALMRS); as described by the Bureau, ALMRS will consolidate data from existing records into a "comprehensive system to display accurately and consistently the relevant facts concerning land and minerals within BLM's jurisdiction." Brief for Appellant at 6–7.

The Bureau is in the process of developing three separate data banks which will be combined with the existing MCRS and CRS files to form the ALMRS. All three of the new data files, the Bureau acknowledges, are drawn from public documents. The three files themselves, however, are non-public, and the Bureau intends them to remain so until they are released as part of the ALMRS.

Of the three data bases currently under development, the file nearest completion is the Legal Land Description file. The LLD file contains geopolitical information about land, such as its location, the relevant political units and administering agency, survey data, and acreage. As the Bureau informs us, the LLD file is

> designed to convert graphic representations contained in the Master Title Plats, BLM planimetric maps, surveys, and various state maps, as well as narrative information in original patent and survey documents, into a series of numerical descriptions.

Brief for Appellant at 8.

The information in the LLD file is now broken down into 17 "data elements"—i.e., categories of information about particular parcels of land.[1] The data elements are

---

**1.** These elements are: meridian; township; range; section; survey type; survey number;

represented on a computer screen as a matrix of letters and numbers. The Bureau anticipates that its selection of data elements may change before the LLD file is integrated into the ALMRS system. By February 1990, the Bureau had completed data collection for the LLD file for fourteen states, including all the states specified in Petroleum Information's FOIA request.

The Bureau emphasizes that the creation of the LLD file involves considerably more than a simple transfer of data from one format (the paper source documents) to another (the computerized LLD file). When source documents yield conflicting or incomplete information on a given tract of land, BLM explains, the Bureau's information compilers must correct or perfect the record; to do so, they must exercise discretion in deciding how such tracts should be represented in the LLD file. Before the LLD file is integrated into the ALMRS and made public, the Bureau intends once again to verify the information in the file. Some of the data now in the LLD file, the Bureau predicts, will be found inaccurate when compared with information from the other data bases, necessitating further corrections.

Along with the existing CRS and MCRS files, two other new data bases will be merged with the LLD file to form the ALMRS: the Status file will contain information about the availability of land for different uses, and the Geographic Coordination Data Base (GCDB) will graphically relate ownership and survey information to physical points on the Earth's surface. The increased accuracy of the information in the ALMRS compared to prior records, the Bureau expects, will "result in an adjustment of previously incorrect property rights." Brief for Appellant at 7. The

Bureau intends to certify the ALMRS as an official record so that it may be used as evidence in litigation.

By contracts effective between 1986 and 1989, the Bureau hired Petroleum Information—a compiler and seller of oil and gas exploration information—to assist in the collection of data for the Status file for eight states. As provided by the contracts, the Bureau gave Petroleum Information access to magnetic computer tapes containing the LLD files for those states; this access was given solely to facilitate the company's collection and entry of information for the Status file. Petroleum Information agreed to return the LLD files upon completion of the work, and promised not to disseminate the files to anyone except as provided in the contracts. The contracts apparently did not bar Petroleum Information from, as said in Brief for Appellant at 31, "do[ing] through the FOIA what the contract prohibits."

In March 1989, Petroleum Information submitted a FOIA request asking the Bureau to release a magnetic computer tape containing part of the LLD file for Montana, Nevada, North Dakota, and Wyoming. The request sought production of nine of the 17 LLD data elements. Petroleum Information acknowledges that, in common with the general public, it has access to the source documents on which the LLD file is based and that it intends, through computer services, to make data on the LLD tape immediately available to its customers.

The Bureau denied Petroleum Information's FOIA request on the ground that the LLD file is protected by the deliberative process privilege contained in Exemption 5.[2] After waiting more than five months for a response to its administrative appeal, Petroleum Information filed this action.

---

survey suffix; aliquot part; acreage; survey note; state; county; congressional district; BLM district; resource area; planning unit; and administrative agency.

**2.** The Bureau's initial letter denying Petroleum Information's request, dated April 10, 1989, cited a second reason for withholding the LLD file, one BLM has not since relied upon. *But cf. infra* p. 1439 (rejecting BLM's plea of qualified

privilege based on "confidential commercial" character of information). The letter stated that release of the data base "to one or a few vendors" would be "premature because of a possible competitive disadvantage vis-a-vis other vendors." Petroleum Information observed in response that BLM could inform others of the Bureau's FOIA disclosure to the company, possibly through a notice in the Federal Register.

On cross-motions for summary judgment, the district court held that the LLD file was not shielded by Exemption 5; the court found the information in the data bank "purely factual" and "neither predecisional nor deliberative." *Petroleum Information Corp. v. Department of Interior*, No. 89–3173, slip op. at 5 (D.D.C. Dec. 20, 1990). The district judge stressed the file's lack of "policy or opinion content." *Id.* at 6. The judge did not see in BLM's categorization, verification, and error-correction work any close resemblance to "the 'give-and-take' of ideas among employees that characterizes the deliberative process Exemption 5 seeks to preserve." *Id.* at 7 (citation omitted). Accordingly, she entered judgment for Petroleum Information.

## II. ANALYSIS

### A. Standard of Review

■ Summary judgment is in order where, viewing the record in the light most favorable to the non-moving party, the court finds that there remains no "genuine issue as to any material fact." Fed. R.Civ.P. 56(c); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). This circuit applies in FOIA cases the same standard of appellate review applicable generally to summary judgments. *See, e.g., Washington Post Co. v. Department of Health and Human Servs.*, 865 F.2d 320, 325–26 & n. 8 (D.C.Cir.1989).[3] In performing that review, however, we are mindful that the "burden is on the agency" to show that requested material falls within a FOIA exemption. 5 U.S.C. § 552(a)(4)(B); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106

S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (holding that "in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden"). When an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption, summary judgment in favor of the FOIA plaintiff is appropriate. *See, e.g., Taxation with Representation Fund v. Internal Revenue Serv.*, 646 F.2d 666 (D.C.Cir.1981) (affirming in part district court's decision on summary judgment that requested IRS documents were outside the scope of Exemption 5 deliberative process privilege).

### B. The Deliberative Process Privilege

■ Exemption 5 excludes from the FOIA's disclosure mandate "inter-agency or intra-agency memorandums or letters which would not be available by law to a party ... in litigation with the agency." 5 U.S.C. § 552(b)(5).[4] The exemption covers items shielded from civil discovery, including documents protected by the "executive" or "deliberative process" privilege. *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150–53, 95 S.Ct. 1504, 1516–18, 44 L.Ed.2d 29 (1975). This privilege shelters "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *Id.* at 150, 95 S.Ct. at 1516 (internal quotation and citation omitted).

While the deliberative process privilege serves a number of related purposes,[5] its

---

**3.** The Ninth Circuit, we note, applies a clearly erroneous standard to district court determinations on summary judgment in FOIA cases. *See, e.g., National Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1116 (9th Cir.1988).

**4.** Because Petroleum Information does not contest the point, we assume without deciding that the LLD file qualifies as an "inter-agency or intra-agency memorandum[ ]."

**5.** *See, e.g., Jordan v. Department of Justice*, 591 F.2d 753, 772–73 (D.C.Cir.1978) (en banc) (citation omitted):

First, [the deliberative process privilege] protects creative debate and candid consideration

of alternatives within an agency, and, thereby, improves the quality of agency policy decisions. Second, it protects the public from the confusion that would result from premature exposure to discussions occurring before the policies affecting it had actually been settled upon. And third, it protects the integrity of the decision-making process itself by confirming that "officials would be judged by what they decided[,] not for matters they considered before making up their minds."

*See also Coastal States Gas Corp. v. Department of Energy*, 617 F.2d 854, 866 (D.C.Cir.1980) (explaining policies).

"ultimate aim" is to "prevent injury to the quality of agency decisions." *Sears,* 421 U.S. at 151, 95 S.Ct. at 1516. In enacting Exemption 5, Congress determined that the "efficiency of Government would be greatly hampered if, with respect to legal and policy matters, all Government agencies were prematurely forced to 'operate in a fishbowl.'" S.REP. No. 813, 89th Cong., 1st Sess. 9 (1965). In light of the FOIA's strong policy in favor of disclosure, however, Exemption 5 is to be construed "as narrowly as consistent with efficient Government operation." *EPA v. Mink,* 410 U.S. 73, 87, 93 S.Ct. 827, 836, 35 L.Ed.2d 119 (1973) (quoting S.REP. No. 813, 89th Cong., 1st Sess. 9 (1965)).

■ To qualify for withholding under Exemption 5's executive privilege, information must be both "predecisional" and "deliberative." *See Access Reports v. Department of Justice,* 926 F.2d 1192, 1194 (D.C.Cir.1991); *Formaldehyde Inst. v. Department of Health & Human Servs.,* 889 F.2d 1118, 1121 (D.C.Cir.1989); *Wolfe v. Department of Health & Human Servs.,* 839 F.2d 768, 774 (D.C.Cir.1988) (en banc). A document is predecisional if it was "prepared in order to assist an agency decisionmaker in arriving at his decision," rather than to support a decision already made. *Renegotiation Bd. v. Grumman Aircraft,* 421 U.S. 168, 184, 95 S.Ct. 1491, 1500, 44 L.Ed.2d 57 (1975). Material is deliberative if it "reflects the give-and-take of the consultative process." *Coastal States Gas Corp. v. Department of Energy,* 617 F.2d 854, 866 (D.C.Cir.1980). Our recent decisions on the "deliberativeness" inquiry have focused on whether disclosure of the requested material would tend to "discourage candid discussion within an agency." *Access Reports,* 926 F.2d at 1195 (quoting *Dudman Communications v. Department of Air Force,* 815 F.2d 1565, 1567–68 (D.C.Cir.1987)). The "first step" in this inquiry "is to examine the context in which the materials are used." *Wolfe,* 839 F.2d at 774.

■ Under the deliberative process privilege, factual information generally must be disclosed, but materials embodying officials' opinions are ordinarily exempt. *See EPA v. Mink,* 410 U.S. 73, 87–91, 93 S.Ct. 827, 836–38, 35 L.Ed.2d 119 (1973) (endorsing fact/opinion distinction); *Quarles v. Department of Navy,* 893 F.2d 390, 392 (D.C.Cir.1990) (observing that "the prospect of disclosure is less likely to make an adviser omit or fudge raw facts, while it is quite likely to have just such an effect" on materials reflecting agency deliberations). The fact/opinion distinction, however, is not always dispositive; in some instances, "the disclosure of even purely factual material may so expose the deliberative process within an agency" that the material is appropriately held privileged. *Mead Data Central, Inc. v. Department of Air Force,* 566 F.2d 242, 256 (D.C.Cir.1977).

In *Quarles,* we held exempt from FOIA disclosure Navy cost estimates prepared in the course of selecting a port for a battleship group. The *Quarles* court explained that the estimates reflected a "complex set of judgments" that "partake of just that elasticity that has persuaded courts to provide shelter for opinions generally." 893 F.2d at 392–93. The district court had expressly determined that disclosure of the estimates could "chill" or distort eventual Navy deliberations concerning the award of a contract to construct the port; we vindicated the district court's conclusion without "stretch[ing] our imaginations." *Id.* at 393. In *Dudman Communications* and in *Russell v. Department of Air Force,* 682 F.2d 1045 (D.C.Cir.1982), this court held preliminary drafts of official military histories exempt on the ground that revelation of editorial changes threatened to "stifle the creative thinking and candid exchange of ideas necessary to produce good historical work." *Dudman Communications,* 815 F.2d at 1569. In *Montrose Chemical Corp. v. Train,* 491 F.2d 63, 68 (D.C.Cir.1974), we held an EPA staffer's summary of voluminous evidence presented at a hearing exempt because the act of culling out relevant evidence involved "a

judgmental process" which could be compromised by disclosure.[6]

 These decisions, which caution against reflexive fact/opinion characterization as the way to decide the full range of Exemption 5 cases, sound a common theme: To fall within the deliberative process privilege, materials must bear on the formulation or exercise of agency policy-oriented *judgment. See, e.g., Quarles,* 893 F.2d at 392–93; *Russell,* 682 F.2d at 1049 (holding draft history exempt because disclosure would "disrob[e] ... an agency decision-maker's judgment"). The deliberative process privilege, we underscore, is centrally concerned with protecting the process by which *policy* is formulated. *See Mink,* 410 U.S. at 87, 93 S.Ct. at 836 (privilege designed to promote "frank discussion of legal and policy matters") (quoting S.REP. No. 813, 89th Cong., 1st Sess. 9 (1965)); *id.* at 89, 93 S.Ct. at 837 ("Exemption 5 requires different treatment for material reflecting deliberative or policy-making processes" and "purely factual, investigative matters"); *Coastal States,* 617 F.2d at 869 (resting conclusion that documents were not within Exemption 5 in part on ground that the documents did not "discuss the wisdom or merits of a particular agency policy, or recommend new agency policy"). To the extent that predecisional materials, even if "factual" in form, reflect an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter, they are protected under Exemption 5. Conversely, when material could not reasonably be said to reveal an agency's or official's mode of formulating or exercising policy-implicating judgment, the deliberative process privilege is inapplicable. *See Playboy Enterprises v. Department of Justice,* 677 F.2d 931, 935 (D.C.Cir.1982) (holding that fact report was not within privilege because compilers' mission was simply "to investigate the facts," and because report was not "intertwined with the policy-making process") (quoting district court); *see also Pacific Molasses Co. v. NLRB,* 577 F.2d 1172, 1183 (5th Cir.1978) (holding privilege inapplicable to "mechanically compiled statistical report which contains no subjective conclusions").

Homing in on, and sheltering material implicating officials' exercise of judgment about policy matters secures the internal agency "give-and-take" Congress meant to protect when it enacted Exemption 5. *See Coastal States,* 617 F.2d at 866. Our decisions recognize that the process of selecting among alternative policies can be delicate and audience-sensitive, susceptible to distortions and vulnerable to fudging when the deliberators fear or expect public reaction.[7] Inquiring whether the requested materials can reasonably be said to embody an agency's policy-informed or -informing judgmental process therefore helps us answer the "key question" in these cases: whether disclosure would tend to diminish candor within an agency. *See Access Reports,* 926 F.2d at 1195; *Dudman Communications,* 815 F.2d at 1568.

---

6. *See Washington Research Project, Inc. v. Department of Health, Education & Welfare,* 504 F.2d 238, 250 (D.C.Cir.1974) (holding fact summaries exempt under *Montrose Chemical), cert. denied,* 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *see also National Wildlife Fed'n,* 861 F.2d at 1119 (9th Cir.) (holding documents exempt, including draft environmental impact statement, because disclosure would reveal agency's evaluation of facts it had assembled); *Lead Industries Ass'n v. Occupational Safety and Health Admin.,* 610 F.2d 70, 85 (2d Cir.1979) (fact summaries prepared by agency protected where disclosure would "demonstrat[e] which facts in the massive rule-making record were considered significant by the decisionmaker"). *But cf. Playboy Enterprises v. Department of Justice,* 677 F.2d 931, 935 (D.C.Cir.1982) (holding that "a report does not become a part of the deliberative process merely because it contains only those facts which the person making the report thinks material").

7. *See United States v. Nixon,* 418 U.S. 683, 705, 94 S.Ct. 3090, 3106, 41 L.Ed.2d 1039 (1974) ("Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decision-making process."). Recognizing the fragility of internal policy deliberation, some of our decisions speak of the "subjective" or "personal" cast of the materials within the scope of the deliberative process privilege. *See, e.g., Coastal States,* 617 F.2d at 866 (stating that deliberative process privilege covers "subjective documents which reflect the personal opinions of the writer").

Our inquiry whether the agency has plausibly demonstrated the involvement of a policy judgment in the decisional process relevant to the requested documents serves a further, complementary purpose; it enables us to contain Exemption 5 within its proper scope. The release of materials that do not embody agency judgments—for example, materials relating to standard or routine computations or measurements over which the agency has no significant discretion—is unlikely to diminish officials' candor or otherwise injure the quality of agency decisions.[8] Requiring disclosure of such materials is fully "consistent with efficient government operation." *See* S.REP. 813 at 9.

### C. Is the LLD File "Deliberative"?

■■■ The Bureau argues that creating the ALMRS involves a deliberative process and that release of the LLD file would uncover that process. Disclosure, the BLM contends, would reveal corrections and estimates made upon transfer of source document information to the LLD file. Furthermore, the Bureau maintains, giving the public the current, provisional LLD file would compromise agency deliberations about the data elements, codes, and format BLM should use in the final version of the LLD file, the one that will be incorporated into the ALMRS and, in that shape, made public. The Bureau emphasizes that the LLD file is being created for the sole purpose of incorporation into the ALMRS, and

that final presentation and organization of the information must await combination of the LLD, Status, and GCDB files. In sum, the BLM expresses concern about public confusion resulting from current release of information that may prove erroneous or incomplete, and about discouraging officials from making needed changes for fear of creating controversy or harming the Bureau's reputation.

The Bureau's arguments are fitted to FOIA doctrine in a lawyerly manner. Upon consideration, however, we agree with the district court that the LLD file is not "deliberative."[9] Two prime characteristics of the material at issue gird our decision. We reiterate, first, that the information in the LLD file comes exclusively from documents now publicly available. Although the acreage estimates prepared by Bureau personnel may involve considerably more than blind translations of existing information into computer language, even these estimates are based closely on the public, paper source documents. Overall, the public availability of the data in the LLD file severely weakens the Bureau's arguments that release of the data base will confuse the public by providing it with erroneous information which falsely appears to have the Bureau's *imprimatur*.[10] In short, one can demur to BLM's insistence that errors mar the current version of the LLD file, for the Bureau does not suggest that the file is any less accurate

---

**8.** Even the most mundane material could be said to reflect the exercise of agency discretion in some sense, for example, by indicating the typeface an official favors. *See Playboy Enterprises*, 677 F.2d at 935 (remarking that "[a]nyone making a report must of necessity select the facts to be mentioned in it," but explaining that such commonly-made choices generally do not trigger privilege). To be protected under Exemption 5, the kind and scope of discretion involved must be of such significance that disclosure genuinely could be thought likely to diminish the candor of agency deliberations in the future.

**9.** Because we conclude that the LLD file is not "deliberative," we need not and do not decide whether the district court correctly ruled that the LLD file is not "predecisional." *See generally NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–52, 95 S.Ct. 1504, 1517, 44 L.Ed.2d 29 (1975)

(discussing predecisional/postdecisional distinction); *Access Reports v. Department of Justice*, 926 F.2d 1192, 1195–96 (D.C.Cir.1991) (explaining relationship between "predecisional" and "deliberative" requirements).

**10.** We have cited the risk of public confusion as a subsidiary rationale for the deliberative process privilege. *See Jordan*, 591 F.2d at 772–73. This rationale has special force with respect to disclosures of agency positions or reasoning concerning proposed *policies. See id.; Coastal States*, 617 F.2d at 869. The rationale, however, does not support a blanket exemption for information marred by errors, particularly when the information is in large part already public. *See Assembly of California v. Department of Commerce*, 968 F.2d 916, 923 (9th Cir.1992) ("[I]t is not among FOIA's functions to control the use of disclosed information.").

than the already public source documents. The Bureau, moreover, does not convincingly explain why its concerns with public confusion and harming its own reputation could not be allayed by conspicuously warning FOIA requesters that the LLD file is as yet unofficial and that the Bureau disclaims responsibility for any errors or gaps.

■ Remarkably, the Bureau seeks to turn the public availability factor to its advantage. BLM argues that, because Petroleum Information could obtain substantially the same information by consulting public source documents, LLD file disclosure would not serve the purposes of the FOIA. *See* Brief for Appellant at 27. The FOIA, however, is largely indifferent to the intensity of a particular requester's need. *See, e.g., EPA v. Mink*, 410 U.S. at 86, 93 S.Ct. at 835. Nor is an agency relieved of an obligation to disclose simply because information is publicly available elsewhere. *See Department of Justice v. Tax Analysts*, 492 U.S. 136, 150–53, 109 S.Ct. 2841, 2850–52, 106 L.Ed.2d 112 (1989) (refusing to adopt public availability as a factor in determining whether a document had been improperly withheld).[11]

When an agency has already made records available under subsections (a)(1) or (a)(2) of 5 U.S.C. § 552, the FOIA explicitly provides that the agency need not disclose the records in response to a FOIA request under subsection (a)(3). *See Tax Analysts*, 492 U.S. at 152, 109 S.Ct. at 2851. No provision of this order is available to the Bureau, however. The BLM has not published the LLD file in the Federal Register pursuant to subsection (a)(1); nor has it made the file available for public inspection or copying under subsection (a)(2). In any event, the prior public availability of information surely does not strengthen an agency's claim to the *deliberative process* privilege.

■ The Bureau also suggests that because the information in the LLD file is available elsewhere, Petroleum Information *must* be using the FOIA to uncover BLM deliberations. *See* Brief for Appellant at 25. But the Bureau itself has effectively described the difficulties of using the paper source documents; Petroleum Information cannot be faulted for seeking to avoid the trouble of amassing information the Bureau has already collected. *See Tax Analysts v. Department of Justice*, 845 F.2d 1060, 1066 n. 12 (D.C.Cir.1988) (noting the "subsidiary FOIA purpose of providing public access to the storehouse of information that agencies gather in the course of government business"), *aff'd*, 492 U.S. 136, 109 S.Ct. 2841, 106 L.Ed.2d 112 (1989).

A second salient characteristic of the information at issue is its lack of association with a significant *policy* decision. The Bureau's mission in creating the ALMRS, while challenging and important, is essentially technical and facilitative. BLM's task is to organize public records in a more manageable form, and to correct any errors it finds in the process. We see nothing in this endeavor akin to the political concerns implicated in locating military bases that figured in *Quarles*, 893 F.2d at 393, or the interpretation of "complex and controversial events" critical to the writing of official histories. *See Russell*, 682 F.2d at 1048 ("The Air Force depends on this official statement to provide a basis for future military and public policy decisions."); *see also Dudman Communications*, 815 F.2d at 1568–69 (applying *Russell*). The essen-

---

**11.** The Bureau suggests that *Dismukes v. Department of Interior*, 603 F.Supp. 760 (D.D.C.1984), is a better guide than *Tax Analysts* for the FOIA problem presented in this case. *Dismukes* held that a FOIA requester is not entitled to "specify the format of data he seeks from an agency." *Id.* at 760. Thus, a requester could not require the agency to supply the requested information on a computer tape when the agency had in good faith supplied the information on microfiche, found by the court to be a "reasonably accessible form" better tailored to the needs of the public. *Id.* at 763. *Dismukes* addressed identical information recorded on alternate media, and thus is far narrower than the Bureau suggests. Assuming, without deciding, that *Dismukes* survives *Tax Analysts*, the instant case does not involve "twice-recorded information" in the limited *Dismukes* sense, *see id.* at 762; if the Bureau's description of the difficulties of current record-keeping systems is correct, BLM could not provide Petroleum Information with the requested information in "reasonably accessible form."

tially technical, record-keeping nature of the Bureau's task circumscribes the Bureau's exercises of discretion and judgment calls. The technical, objective tenor of the LLD materials also reduces the likelihood that disclosure would result in public criticism of individual BLM employees. *See Coastal States,* 617 F.2d at 869 (explaining that because documents did not contain "subjective, personal thoughts on a subject," disclosure was unlikely to "subject the writer ... to ridicule or criticism").

The LLD file differs markedly from the factual materials we have held exempt under the deliberative process privilege. This is not a case in which an agency has winnowed a mass of information into a small set of facts which, if revealed, would unveil the agency's reasoning by showing what it considered relevant (and irrelevant). *See, e.g., Montrose Chemical,* 491 F.2d at 68 ("[S]eparating the pertinent from the impertinent is a judgmental process, sometimes of the highest order[.]"). The Bureau, in the main, is transferring in full information contained in public source documents, albeit with corrections where the documents are inaccurate or in conflict, or additions when records are incomplete. The objective, in sum, is not so much to select and edit as to reorganize and repackage a mass of dispersed public information.

We take up next and specifically two particular facets of the case highlighted by BLM: the acreage estimates and the choice of data elements. The Bureau argues that the acreage estimates sometimes made by its personnel—like the superficially "objective" cost estimates in *Quarles*—in fact embody highly discretionary choices. In *Quarles,* we noted that cost estimates for Navy port sites "derive from a complex set of judgments—projecting needs, studying prior endeavors and assessing possible suppliers." 893 F.2d at 392–93. The acreage estimates Bureau personnel must make when source documents are inaccurate or incomplete are of a less "elastic" order. Each acreage estimate must fit with the source document information for that parcel of land. The BLM may find it necessary to examine other documents, measure boundary lines on a map, use a dot grid, or even resort to "eyeball estimates." *See* Reply Brief at 7. The process may be taxing, but it does not appear to involve the breadth of discretion, and the wide range of considerations, the many forecasts and "judgment calls" involved in making the cost projections at issue in *Quarles. See Quarles,* 893 F.2d at 393 (distinguishing cases holding appraisals of property nonexempt, relying in part on the ground that "they seem to involve fewer judgment calls than estimates of what construction will cost").[12]

The Bureau contends that disclosure of the information requested could prejudice its ultimate choice of data elements, codes, and format for the final version of the LLD file. Again, we do not question that the decisions implicated here demand special care and technical skill; but again, the Bureau's discretion is circumscribed by the need to retain existing categories of land information.[13] We do not see in the data

**12.** Recently, the Ninth and Eleventh Circuits have returned inharmonious decisions on the application of Exemption 5 to computer tapes containing solicited, but unused statistically adjusted figures for the 1990 census. The Ninth Circuit held the material nonexempt; that court found the information factual and incapable of disclosing the agency's deliberative process. *See Assembly of California v. Department of Commerce,* 968 F.2d 916, 922 (9th Cir.1992). The Eleventh Circuit held similar information exempt as "opinion." *Florida House of Representatives v. Department of Commerce,* 961 F.2d 941, 950 (11th Cir.1992). We need not enter that fray, for neither decision detracts from our ruling in this case. The Ninth Circuit's decision that release of the census tapes could not compromise agency deliberations obviously does not tug against our disposition. The Eleventh Circuit emphasized the large discretion the Secretary of Commerce has in census-reporting matters. *See id.* at 949–50. It suffices to point out that the BLM's choices regarding the LLD file are neither so broad nor so politically-charged as those involved in deciding upon adjustments to the population count shown in the census.

**13.** An internal Bureau of Land Management memorandum expressing an official's opinion about the merits of proposed data elements, codes or formats might present a significantly different case for exemption. We express no opinion on such a case.

elements, codes, and format choices, to the extent they have been explained to us, the "candid or personal" decisions that, if revealed prematurely, would be likely to "stifle honest and frank communication within the agency." *Coastal States*, 617 F.2d at 866. The Bureau replays here a constant refrain. If the LLD file were disclosed, BLM fears, agency personnel, concerned that the public would come to rely on the provisional LLD file, would be discouraged from making improvements in the data elements. But as we have previously commented, nothing prevents BLM from warning users that the file is unfinished, subject to change, part of a total ALMRS system still in progress.

### D. Confidential Commercial Information

 The Bureau also suggests that the LLD file should be exempt as "confidential commercial information" shielded by Federal Rule of Civil Procedure 26(c)(7) as partially incorporated in Exemption 5 under *Federal Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). In *Merrill*, the Supreme Court held that Exemption 5 "incorporates a qualified privilege for confidential commercial information, at least to the extent that this information is generated by the Government itself in the process leading up to awarding a contract." *Id.* at 360, 99 S.Ct. at 2812. The Bureau has not begun to explain how one could regard the LLD file information as either confidential or commercial. Nor has the Bureau asserted that the data base was generated as a prelude to awarding a contract. BLM's resort to *Merrill* is therefore unavailing.

We recognize that decisions under the FOIA are sometimes elusive, filled with statements conceptually sound yet slippery to apply. But we recall, finally, this overarching instruction: FOIA precedent, like the exemptions the decisions construe, must be read circumspectly, with the statute's dominant disclosure direction always in view. *See, e.g., Department of Justice v. Julian*, 486 U.S. 1, 8, 108 S.Ct. 1606, 1611, 100 L.Ed.2d 1 (1988) (cautioning that the "mandate of the FOIA calls for broad disclosure of Government records, and for

this reason ... FOIA exemptions are to be narrowly construed") (citations and internal quotations omitted).

### CONCLUSION

The district court correctly held that the Bureau's LLD file is outside the scope of Exemption 5. We agree that composition of the file does not impact on the development of policy judgments of the kind sheltered by the deliberative process privilege. Accordingly, the judgment of the district court granting summary judgment in favor of FOIA requester Petroleum Information is

*Affirmed.*