**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EDWARD F. HENNESSEY, IV,
Plaintiff-Appellant,

v.

No. 97-1133

UNITED STATES AGENCY FOR
INTERNATIONAL DEVELOPMENT,
Defendant-Appellee.

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Robert D. Potter, Senior District Judge.
(CA-95-479-3-P)

Argued: July 10, 1997

Decided: September 2, 1997

Before WILKINS, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Reversed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Robert Walker Fuller, III, ROBINSON, BRADSHAW &
HINSON, P.A., Charlotte, North Carolina, for Appellant. James
Michael Sullivan, Assistant United States Attorney, Charlotte, North
Carolina, for Appellee. **ON BRIEF:** Lawrence C. Moore, III, ROB-
INSON, BRADSHAW & HINSON, P.A., Charlotte, North Carolina,
for Appellant. Mark T. Calloway, United States Attorney, Charlotte,
North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Appellant Edward Hennessey brought this action in district court against the United States Agency for International Development (USAID) under the Freedom of Information Act (FOIA), 5 U.S.C. § 552, to compel USAID to provide him with a report and related documents. On the parties' cross motions for summary judgment, the district court granted summary judgment for USAID, holding that the requested documents were exempt from disclosure under 5 U.S.C. § 552(b)(5) because they fall within the deliberative process and work-product privileges. Hennessey appeals. For the reasons explained, we reverse.

I.

The facts giving rise to this dispute began in 1988, when USAID awarded a $17.6 million construction contract to a company named Encorp to build an agricultural university in Peshawar, Pakistan. The project encountered substantial delays which Encorp alleges were caused by USAID's inept administration of the project. Eventually, Encorp submitted a claim to USAID seeking reimbursement of those costs for which it believed USAID was responsible. USAID rejected many of the assumptions underlying Encorp's claim and, in order to facilitate a resolution of the dispute and complete the project, officials at USAID commissioned a third party to conduct an independent review of the project delays.

To that end, USAID hired the Neilsen-Wurster Group (NWG) to perform a detailed scheduling analysis, or a "critical path method" (CPM) report of the project history. The NWG report comprises three parts. The first part includes the "as-built" data, which is an historical record of when the various project construction activities took place. The second part is the methodology, pursuant to which the project

2

was divided into several "windows," or time periods, and events that affected the project schedule during each window were examined. The third part is the causation analysis, which synthesizes the relationships between the various scheduling delays and the ultimate delay in the completion date. This portion also attributes responsibility for specific delays between USAID and Encorp.

When USAID commissioned the CPM, an official at the agency expressed her intention to share a full copy of the report with Encorp upon its completion. In return, Encorp promised to and did cooperate with the agency by sharing scheduling software and documents. J.A. at 312-13, 424, 570-73.

Over two years after USAID committed to provide Encorp with the final CPM, the agency sent a draft of a substantial portion of the report to Encorp for its review and comments. J.A. at 563-64. Encorp declined to comment on the report on the grounds that the draft was incomplete. J.A. at 522 & 573. USAID subsequently refused to share the entire final report with Encorp.

After failing to obtain the NWG documents directly from USAID, Edward Hennessey, acting as an agent for Encorp, brought this action under FOIA, 5 U.S.C. § 552, to compel USAID to produce the final NWG report, drafts of the NWG report, and correspondence between NWG and USAID concerning the report.[1] In its final response to this

_____

[1] Specifically, Hennessey sought,

a. All schedules, schedule analyses, draft and final reports, correspondence, memoranda, and other documents prepared in whole or in part by Nielsen-Wurster Group with respect to the construction of the Northwest Frontier Province Agricultural University in Peshawar, Pakistan (the "project"); and

b. All schedules, schedule analyses, draft and final reports, correspondence, memoranda, and other documents received from Nielsen-Wurster Group with respect to the project; and

c. All contracts, agreements, and correspondence establishing the scope of work and terms of engagement of Nielsen-Wurster Group with respect to the project.

J.A. at 10 (Plaintiff's Complaint).

FOIA action, USAID declared its intention to withhold the requested records on the grounds that they were deliberative process materials and confidential work-product which were exempt from disclosure pursuant to FOIA's so-called "Exemption 5," 5 U.S.C. § 552(b)(5).

Both parties moved for summary judgment, and the district court granted summary judgment for USAID, holding that there was no genuine issue that the contested documents were exempted from disclosure by both the deliberative process and work-product exceptions. The district court also conducted an in camera review of the requested documents and concluded that "any factual materials contained therein is inextricably linked with deliberative and/or work-product such that it is protected by these privileges." J.A. at 720. Thus, the district court also refused to order the disclosure of what it considered to be purely factual portions of the requested materials. Appellant-Hennessey appeals both rulings.

II.

Although FOIA imposes a broad duty upon government agencies to disclose requested documents, see 5 U.S.C. § 552(a), that duty is not without limitation. For example, FOIA exempts from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). This open-ended exemption incorporates both the deliberative process and work-product privileges. Virginia Beach v. Department of Commerce, 995 F.2d 1247, 1251 (4th Cir. 1993). We examine in turn USAID's claims of deliberative process and work-product privilege, ultimately reviewing the district court's judgment de novo to determine whether a genuine issue of material fact exists as to whether the subject documents are protected by the deliberative process privilege or work product privilege, or whether USAID or Hennessey is entitled to judgment as a matter of law at this stage of the litigation.**2** In undertaking this

_____

**2** Although it would appear, at first blush, that the § 552(b)(5) exemption would not apply to the documents at issue in this case because they were prepared by an outside consulting firm (NWG) and therefore do not seem to be "intra-agency memorandums," the district court below held

4

review, we construe Exemption 5 narrowly, as we are required to do in order to give full effect to this public disclosure statute. See Ethyl Corp. v. Environmental Protection Agency, 25 F.3d 1241, 1245 (4th Cir. 1994).

A.

The deliberative process privilege protects Executive deliberations from public scrutiny in order to encourage "open[ and] frank discussion between subordinate and chief concerning administrative action." Environmental Protection Agency v. Mink , 410 U.S. 73, 87 (1973). The privilege permits the government to withhold certain documents whose release would reveal "advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." In re: Sealed Case, 116 F.3d 550, 557 (D.C. Cir. 1997) (citation omitted). The privilege attaches only to documents that "reflect[ ] the give-and-take of the consultative process by revealing the manner in which the agency evaluates possible alternative policies or outcomes." Virginia Beach v. Dep't of Commerce, 995 F.2d 1247, 1253 (4th Cir. 1993) (citation and internal quotation marks omitted). The ultimate issue in evaluating any deliberative process privilege claim is "whether the materials bear on the formulation or exercise of agency policy-oriented judgment . . . [and]

_____

that the § 552(b)(5) exemption also applies to documents commissioned by an agency from outside experts for the purposes of informing the agency's judgment. The district court's interpretation of the statutory term "intra-agency" is by no means unreasonable, and it has actually garnered the support of a number of our sister circuits, Thurner Heat Treating Corp. v. NLRB, 839 F.2d 1256 (7th Cir. 1988); CNA Financial Corp. v. Donovan, 830 F.2d 1132 (D.C. Cir. 1987), as well as the assent of three Supreme Court Justices, United States Dep't of Justice v. Julian, 486 U.S. 1, 18 n.1 (1988) (Scalia, J., dissenting). However, because we reverse the district court's grant of summary judgment, and direct the district court to enter summary judgment in favor of appellant because there is no genuine issue that the documents at issue in this case are either deliberative process materials or work-product, we need not reach the question of whether these two privileges, if otherwise satisfied, would apply under § 552(b)(5) to documents produced by an outside expert.

5

whether disclosure would tend to diminish candor within an agency." Id. at 1254 (citation and internal quotation marks omitted) (emphasis in original).

After reviewing the record in this case, the final NWG report itself, and the circumstances in which the final report was to be used, see Virginia Beach, 995 F.2d at 1253, we conclude that the final report is not protected by the deliberative process privilege. From its inception, the process of producing this report was intended as a cooperative enterprise designed to resolve a dispute between Encorp and USAID that arose over the Peshawar project. It was clearly contemplated by both parties that Encorp would be a co-equal partner in this effort to develop a chronology and factual account of the events surrounding the delays in the project. The process was never viewed as a "deliberative" activity exclusively between NWG and USAID.

It is undisputed, for example, that USAID intended to share the final NWG report with Encorp in order to facilitate completion of the project and resolve the outstanding differences between the parties. A USAID contracting officer, who was the Chief of USAID's Pakistan Office of Contracts and Commodities, committed to Encorp, prior to commissioning the CPM, that USAID would share a full copy of the final CPM report with Encorp upon its completion. J.A. at 424. This official later testified that her purpose in commissioning the NWG report was to facilitate a discussion of Encorp's claim and "further the completion of the project." J.A. at 342. In fact, it appears that this promise to share the final NWG report is why Encorp shared its data and software with USAID and NWG. See, e.g., J.A. at 424. Furthermore, after USAID hired NWG, but before the final report was available, a subordinate USAID contracting officer who was involved in the Peshawar project represented in writing to Encorp that "USAID is commencing its analysis of the Contract progress delays" and "hopefully, we will have results for your review and negotiations in about six weeks." J.A. at 572-73. Appellee does not dispute this testimony, nor does it deny that the aforementioned Chief of USAID's Pakistan office was the "ultimate decisionmaker" with regard to the Peshawar project. See J.A. 338. Thus, there is no genuine issue that, prior to receiving the final NWG report, USAID intended to share that report with Encorp and committed to do so. Indeed, consistent with its intent and promise, USAID actually provided Encorp with what it

6

now admits was "a substantial part of the NWG analysis" in draft form. Appellee's Brief at 24.

Against this backdrop, it is clear, as a matter of law, that these documents are not protected by the deliberative process privilege. The agency had the opportunity, if not the prerogative, to shield these materials from public disclosure through invocation of the deliberative process privilege, but it chose instead to open to the public its process of preparing this report by making Encorp a participant in that process in the hope that the agency's dispute with Encorp would be facilitated thereby. As a consequence, there simply is no intra-agency "deliberative process" to be protected. And, it goes without saying, disclosure of the final report to Encorp under such circumstances would not in any sense chill open and frank communications within USAID in the future. The agency may invite members of the public into its "deliberations" as it deems appropriate. Or it may avail itself of the privilege by keeping its own counsel.

Essentially, the agency's only response is that it was not contractually bound with Encorp to share the CPM, and that Encorp therefore cannot compel the agency to furnish the report. Thus, USAID maintains that Encorp's suit is properly brought in the Court of Claims as a government contract action. Encorp, however, does not contend that disclosure of the NWG report is required by the terms of an enforceable contract with USAID, nor, in holding that the report is not protected by the deliberative process privilege, do we suggest that such a contract exists between the parties. Rather, Encorp argues, and we hold, only that the agency may not assert the deliberative privilege to protect documents that it intended to produce to the public, promised to produce to the public, and in fact did, in substantial part, produce to the public.

That the final NWG documents were never intended to be, and are not, deliberative materials is also confirmed by our examination of the documents themselves. With few exceptions, purely factual materials are not protected by the deliberative process privilege, see Ethyl Corp., 25 F.3d at 1249 (holding that statistical data were not deliberative process materials). Insofar as we can discern, the final NWG report is almost entirely factual in nature. The district court concluded that several portions of the report could not have been produced with-

7

out the exercise of some judgment and are therefore closer to opinion than fact. For example, it reasoned that the methodology section was not factual because it involved an assessment of which particular steps in the construction project had an effect upon overall delays. It further reasoned that the causation section was not purely factual because it included "recommendations concerning Encorp's responsibility, if any, for delay in completion of the project to-date." J.A. at 708.[3] While it is doubtless true that the process of composing these portions of the final report may have involved the exercise of some judgment or discretion, the NWG report must ultimately be regarded as factual because it is written as an objective and retrospective recitation of historical facts. To illustrate the factual nature of the CPM, consider one of its typical conclusions: for the first "critical path" in the time period ranging from November 17, 1988, to April 15, 1989 -- the construction of the library -- Encorp utilized a 35-day mobilization period (instead of the 60 days allowed by contract specification), was 16 calendar days late in beginning construction, made significant out-of-sequence work, and ultimately gained 17 days on the critical path of 150 projected construction days. A typical entry from the report's causation analysis, which discusses the period from April 16, 1989, to September 16, 1990, identifies 37 days of project delay arising out of Encorp's tardy pouring of concrete footings. To the extent that any portion of the report expresses an "opinion," it is simply an opinion regarding what occurred in the past rather than advisory opinion regarding future agency action. The entire final NWG report, consequently, is unprotected by the deliberative privilege.

---

[3] The district court also concluded that the final NWG report includes "recommendations concerning whether Encorp's claim should be compromised." J.A. at 708. After reviewing the record, as well as the final NWG report itself, we appreciate that the report discusses facts underlying Encorp's claim. We are unable to find any portions of the final report, however, that constitute "recommendations concerning whether Encorp's claim should be compromised." At most, the report recites facts that USAID may find helpful in compromising its claim with Encorp. The document does not set forth recommendations concerning whether USAID should compromise that claim, and if so, how it should proceed to do that.

8

Nor does the final NWG report "bear on the formulation or exercise of agency policy-oriented judgment." <u>Virginia Beach</u>, 995 F.2d at 1254. The district court concluded that the final NWG report is relevant to the government's "policy" of evaluating and settling Encorp's claim against USAID. While acknowledging that this is not the traditional understanding of a governmental"policy," the district court nevertheless declined "to limit the deliberative process privilege to cases that only relate to more generalized policy-making decisions as opposed to decisions made in specific cases . . . because both situations implicate the concerns that motivate the privilege." J.A. at 711. This reasoning, taken to its logical conclusion, would shield virtually all government records from disclosure. From a review of the record, it is evident that the final report does not bear on a policy-oriented judgment of the kind contemplated by Exemption 5. The information included in the report at issue at most informs USAID's decision of whether to settle Encorp's claim for delays arising out of a garden variety construction scheduling dispute over an agricultural university in Peshawar, Pakistan. The resolution of such a minor issue is "essentially technical and facilitative" and therefore not the type of decision protected by the deliberative privilege. <u>See Petroleum Information Corp.</u> v. <u>Dep't of Interior</u>, 976 F.2d 1429, 1437 (D.C. Cir. 1992) (holding that a data file fell outside the deliberative process privilege, even though creation of the file involved the exercise of discretion in how to represent data, in part because the file was not used to implement "a significant <u>policy</u> decision" and was "essentially technical and facilitative") (emphasis in original). Indeed, to the extent that such a decision can be regarded as a "policy" at all, which we doubt, it must be viewed at the very outer limits of that type of decision. It is not at all the "stuff" of the deliberative process privilege.

This is not the typical deliberative process case where the government jealously guards certain documents which embody or incorporate a subordinate's pre-decisional advice, the disclosure of which would chill others from offering candid advice to the agency in the future. Nor is this a case where the disclosure of certain documents would reveal the manner in which an agency formulates policy and thus threaten the integrity of future agency decision-making. Rather, this is a case where the agency asserts a privilege with respect to a document that is seemingly entirely factual in character and that was prepared with the expectation that it would be shared with the very

9

party from whom the government now attempts to withhold the document. Under such circumstances, summary judgment properly belongs to the appellants, not to the government agency.

B.

The district court also granted summary judgment for USAID on the ground that the final NWG report is protected by the work-product privilege. Documentary evidence qualifies as work-product if it is prepared "in anticipation of litigation." E.g. National Union Fire Ins. v. Murray Sheet Metal, 967 F.2d 980, 984 (4th Cir. 1992). That is, "[t]he document must . . . [have been] prepared because of the prospect of litigation;" "materials prepared in the ordinary course of business . . . or for other non-litigation purposes" are not protected. Id. (emphasis in original). The district court held that there was no issue that the final NWG report is work-product primarily because Encorp had threatened USAID with litigation before the agency commissioned the report. In this conclusion as well, we believe that the district court erred.

USAID commissioned the final report with the purpose of sharing it with Encorp in order to "further the completion of the project" or "get the project done." J.A. at 342. Furthering completion of the project is a non-litigation purpose, and thus, the report was not commissioned "because of the prospect of litigation." The district court reasoned that neither USAID's commitment to share the report nor its intention to use the report for non-litigation purposes defeats USAID's work-product claim because the "potential sharing of information to further settlement negotiations in no way precludes the preparation of the document in anticipation of litigation." J.A. at 716. The record, however, establishes not merely that USAID intended a "potential sharing of information" with Encorp, but that USAID indisputably intended to share the report with Encorp and actually did share a substantial portion of the report with Encorp. Because sharing the final report with Encorp is incompatible with withholding it from Encorp as work-product, the final report simply cannot be considered work-product.

III.

The foregoing analysis applies only to the final NWG report, and with respect to the draft report and correspondences we reach a differ-

10

ent conclusion. Although the Chief of USAID's Contracting Office in Pakistan represented to Encorp its intention to share the final report, that same official denies promising to furnish Encorp with "all correspondence" or "all written analyses of any kind" concerning the final report. J.A. at 254. Furthermore, because we do not appear to have the draft report or related correspondences, we are unable to perform our own in camera review of those materials in order to determine whether they are protected by the deliberative process or work-product privileges. Accordingly, to the extent that there remains a dispute over these documents following our opinion today, that dispute should be brought anew before the district court for resolution in light of the foregoing opinion. The district court's judgment with respect to these agency records is hereby vacated.

CONCLUSION

With respect to disclosure of the final NWG report, the judgment of the district court is reversed and the case is remanded with instructions to enter judgment for appellant Hennessey. With respect to any drafts of the NWG report and any correspondences between USAID and NWG pertaining thereto, the judgment of the district court is vacated and the case remanded for such proceedings as may be necessary.

REVERSED AND REMANDED