HAMILTON SECURITIES GROUP
INC., Plaintiff,

v.

DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT, Office
of Inspector General, Defendant.

No. Civ.A. 99–1563 (ESH).

United States District Court,
District of Columbia.

July 17, 2000.

Michael J. McManus, Drinker Biddle & Reath, Washington, DC, for plaintiff.

Stacy M. Ludwig, Assistant U.S. Attorney, U.S. Attorney's Office, Washington, DC, for defendant.

### MEMORANDUM OPINION

HUVELLE, District Judge.

. Plaintiff, Hamilton Securities ("Hamilton"), seeks materials from the 1996 audit of the Federal Housing Administration's mortgage loan sale program under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In particular, Hamilton asks this Court to order the Office of the Inspector General of the Department of Housing and Urban Development ("HUD OIG") to produce the records prepared and accumulated by auditors from the Rocky Mountain District Office of Audit and to award Hamilton its costs and reasonable attorney fees as provided by 5 U.S.C. § 552(a)(4)(E). As explained more fully below, the Court concludes that it lacks subject matter jurisdiction, or in the alternative, that these materials are exempt from production under Exemption (b)(5) of FOIA. Therefore, defendant's motions to dismiss and for summary judgment will be granted.

### FACTS

At issue are materials gathered as part of an OIG audit of HUD's loan sales program that was suspended when the OIG began a separate investigation of Hamilton Securities. Hamilton was HUD's financial adviser in the loan sales program. According to the Declaration of Joseph Haban, filed in support of defendant's motion, the HUD OIG's Rocky Mountain District Office of Audit began a routine audit of HUD's loan sales program in September 1995. In June 1996, two lawsuits were filed that related directly to the loan sales program. In the first, *Ervin and Associates, Inc. v. Dunlap, U.S. Dep't of Housing and Urban Development*, No. 96–1253 (D.D.C. filed June 5, 1996), plaintiff alleged that HUD and certain individuals "used Hamilton's control over HUD's note sales process to embark on a complex scheme to deliver huge blocks of discounted multifamily and single family HUD-owned notes to prominent Wall Street firms." Motion to Dismiss at 19. The second, *United*

*States ex rel. v. Hamilton Securities Group,* No. 96–1258 (D.D.C. filed June 6, 1996), is a *qui tam* investigation related to the loan sales program. In July 1996, the U.S. Attorney's Office for the District of Columbia requested the HUD OIG's assistance in investigating the *qui tam* complaint, and the OIG began an investigation into both the *qui tam* and the *Ervin* complaints. In November 1996, work on the audit was suspended pursuant to an order by the HUD OIG. In February 1997, materials relating to the audit were incorporated into the investigative file on HUD's note sale program.

By letter to Judith Heatherton, Counsel to the Inspector General, dated July 13, 1998, Hamilton requested "a copy of the Denver audit of Hamilton" from the HUD OIG. HUD's FOIA Officer, Darlene Hall, responded by letter dated July 20, 1998, that the OIG did not "possess or control 'a copy of the Denver audit of Hamilton,'" but construed the letter to be a FOIA request for "a copy of the draft audit report of the Federal Housing Administration's loan sales program, ... which was commenced but not completed by OIG's Rocky Mountain District Office of Audit." The HUD OIG refused to disclose the draft audit report, claiming that it was shielded from disclosure by 5 U.S.C. §§ 552(b)(5) and (b)(7)(A). The letter further explained that, pursuant to the OIG's FOIA regulation, 24 C.F.R. § 2002.25, plaintiff could seek administrative review of the denial by the Inspector General ("IG") within 30 days of the date of the denial letter.

Hamilton appealed the decision by letter dated August 20, 1998, arguing that neither the deliberative process privilege under Exemption 5 nor the privilege protecting law enforcement records under 7(A) precluded disclosure of the requested documents. The IG denied Hamilton's appeal on four grounds. First, the appeal was untimely, having been filed one day late, on August 20, 1998, when the 30–day period for filing an administrative appeal ended on August 19, 1998. Second, the appeal did not challenge the law enforcement investigative privilege under Exemption 5 and therefore, the IG could treat the appeal as moot and other exemptions would not need to be considered. Third, the IG nonetheless addressed the merits of Hamilton's challenge and concluded that the draft audit was protected by the deliberative process privilege under Exemption 5 because it was pre-decisional and deliberative. And fourth, the IG concluded that the audit was protected by Exemption 7(A) because its disclosure " 'could reasonably be expected to interfere' with pending law enforcement activity."

On June 16, 1999, Hamilton filed a Complaint for Declaratory and Injunctive Relief, requesting that this Court declare unlawful the HUD OIG's refusal to produce the requested records and order the HUD OIG to produce the records prepared and accumulated by the Denver auditors.

In response, the HUD OIG has filed both a motion to dismiss for lack of subject matter jurisdiction, based on Hamilton's failure to exhaust its administrative remedies by filing an untimely appeal with the IG and by requesting documents beyond those originally requested from the agency, and a motion for summary judgment based on the validity of withholding the documents under Exemptions 5 and 7(A). Hamilton opposes the motions to dismiss and for summary judgment and has requested leave to conduct discovery.

This Court upholds the HUD OIG's decision to withhold the draft audit materials on two grounds, either of which would be sufficient to defeat Hamilton's claim. First, Hamilton failed to exhaust its administrative appeals by filing an untimely appeal to the IG. Second, the draft audit report is protected from disclosure by the deliberative process privilege provided in Exemption 5 of the FOIA. Finally, this Court finds no bad faith or contradictory evidence in the record justifying defendant's request for discovery.

## ANALYSIS

### I. MOTION TO DISMISS

■ This Court has jurisdiction to enjoin agencies from improperly withholding records requested under the Freedom of Information Act, 5 U.S.C. § 552(a)(4)(B), but a plaintiff must first exhaust all administrative remedies before seeking judicial relief. *See Oglesby v. U.S. Dep't of the Army*, 920 F.2d 57, 61–2 (D.C.Cir.1990) (holding that courts have consistently required exhaustion of administrative remedies under FOIA). If a plaintiff fails to exhaust its administrative remedies, this Court lacks subject matter jurisdiction to adjudicate the claim. Here, the HUD OIG argues that the Court lacks subject matter jurisdiction over documents other than the Denver draft audit, since the original FOIA request was limited in scope to the audit only and did not include, as does the Complaint, a request for documents compiled or created in connection with the audit. The HUD OIG also argues that the Court lacks subject matter jurisdiction over plaintiff's entire claim because Hamilton filed its administrative appeal one day late.

#### A. *Scope of Plaintiff's FOIA Request*

The HUD OIG argues for dismissal of Hamilton's claim for documents other than the Denver draft audit, since the original FOIA request and administrative appeal only considered the Denver draft audit. Hamilton denies that it is seeking documents in this lawsuit that it did not include in its original FOIA request. Claiming that FOIA requests are to be construed broadly, Hamilton argues that the HUD OIG understood "the comprehensive nature" of the original FOIA request, since the denial letter referenced "documents compiled or created in connection with that audit."

Hamilton's initial request stated:

During our meeting last week, I again asked you whether or not you would produce a copy of the Denver audit of Hamilton, and you responded by asking that I put that request in writing. I am now doing so. Please provide me with a copy of the Denver audit. Letter from M. McManus to J. Hetherton.

In reply, HUD's FOIA Officer wrote that the OIG construed the FOIA request to:

be a request for a copy of the draft audit report of the Federal Housing Administration's loan sales program, ... which was commenced but not completed by OIG's Rocky Mountain District Office of Audit. Documents compiled or created in connection with that audit have been incorporated into the law enforcement investigative files associated with an ongoing investigation that relates to FHA's loan sales program. Accordingly, the draft audit report, which pertains to only a part of the audit, is being withheld.

In response, Hamilton wrote "to appeal the denial of Hamilton's July 13, 1998 request for a copy of the draft report for the 1997 audit of the Federal Housing Authority's loan sales program." Although Hamilton challenged HUD's reasons for denying the FOIA request, it never challenged the scope of the request as construed by the HUD OIG.

In *Dettmann v. U.S. Dep't. of Justice*, 802 F.2d 1472, 1473 (D.C.Cir.1986), the Circuit Court upheld the FBI's narrow construction of the appellant's original very broad FOIA request for "all documents" relating to her concern. Because the FBI notified the appellant in writing of its construction of her request and because she was represented by counsel who, based on his "express references to the FBI's procedures, knew full well what the FBI had done," the Court found that she had not exhausted her administrative remedies with respect to anything other than the narrowly construed request. *Id.* at 1476. The Court concluded that "[i]f exhaustion of remedies is to have any meaning, it surely must bar review of the claim advanced here." *Id.* at 1477.

Application of the *Dettmann* analysis to the instant case yields a similar conclusion. Hamilton has not exhausted its administrative remedies for any request beyond that construed by the HUD OIG in response to Hamilton's original FOIA request. Like the appellant in *Dettmann*, Hamilton was notified in writing of the construction of the FOIA request and was represented by counsel who defined his request as "a copy of the draft report," not, as he now argues, all "documents compiled or created in connection with that audit." Hamilton never challenged the narrow construction, although it challenged other aspects of the denial. Finally, unlike the appellant in *Dettmann*, Hamilton's original request contained narrow, not broad, language. Hamilton asked only for "a copy of the Denver audit." While the appellant in *Dettmann* could argue that the FBI unilaterally narrowed her written FOIA request, Hamilton cannot make this argument, but instead falls back on the weaker argument that the HUD OIG should have understood that "a copy of the Denver audit" included "documents compiled or created in connection with that audit." Given the exchange of correspondence between counsel and the agency relating to the scope of the request, there is no basis for plaintiff's claim that defendant should have understood that the request for a draft audit report was meant to include additional documentation.

Thus, this Court has no jurisdiction over plaintiff's request for documents that were not the subject of its original FOIA request to the OIG, since plaintiff has not exhausted its administrative remedies with respect to those documents. The Court will therefore limit its review to the denial of the FOIA request for the draft audit.

B. *Timeliness of the Appeal to the IG*

With respect to the Denver draft audit, the HUD OIG contends that Hamilton failed to exhaust its administrative remedies by filing its appeal to the IG on August 20, 1999, when the 30–day period for appealing the original denial of the FOIA request ended on August 19, 1999. Relying on *Oglesby v. U.S. Dep't of the Army*, the HUD OIG argues that a proper administrative appeal is a prerequisite to filing for judicial review of a FOIA denial, and accordingly, the entire case should be dismissed for lack of subject matter jurisdiction. *See* Fed.R.Civ.P. 12(b)(1).

Hamilton contends that it filed the appeal on time, 30 days after receiving the OIG's denial letter. Hamilton received the letter on July 21 and hand-delivered the appeal 30 days later on August 20. Further, Hamilton argues that *Oglesby* "merely insur[es] that the agency has the opportunity to complete its process before the court steps in" and does not mean that a litigant who files a late appeal is precluded from bringing a FOIA lawsuit. Opposition at 4.

It is well settled that full and timely exhaustion of administrative remedies is a prerequisite to judicial review under FOIA. *See Dettmann*, 802 F.2d at 1477 (holding denial of FOIA request not subject to judicial review where plaintiff failed to fully exhaust administrative remedies with respect to all claims); *Oglesby*, 920 F.2d at 65 ("in future cases foregoing an administrative appeal will preclude the requester from ever bringing suit on that request because the individual will not have exhausted his administrative remedies"); *Kay v. FCC*, 884 F.Supp. 1, 3 (D.D.C.1995) (dismissing case with prejudice for lack of subject matter jurisdiction where plaintiff failed to file an administrative appeal from the denial of his FOIA request and time period for filing such an appeal had elapsed); and *Center to Prevent Handgun Violence v. U.S. Dep't of the Treasury*, 981 F.Supp. 20, 23 (D.D.C.1997) ("[s]trict enforcement of the exhaustion requirement is favored in FOIA cases"). Where plaintiff has failed to exhaust its administrative remedies prior to filing with the court, the case is subject to dismissal for lack of subject matter jurisdiction. *See, e.g., Kay v. FCC, supra.*

In order to determine whether it has subject matter jurisdiction, this Court must first decide whether Hamilton filed its administrative appeal in a timely fashion. As *Oglesby* notes, agencies commonly require administrative appeals within a certain time limit. 920 F.2d at 65 n. 9. The HUD OIG's FOIA regulation states that "Review is available only from a written denial of a request for a record ... and only if a written request for review is filed within 30 days after issuance of the written denial." 24 C.F.R. § 2002.25(a). The original denial letter informed Hamilton that the FOIA regulations provide for "administrative review by the Inspector General of any denial of information if a written appeal is filed within 30 days from the date of this letter." Despite the clear notice provided by the denial letter, Hamilton appealed one day beyond the time limit. Hamilton argues that its thirty-day period ran from the date of receipt of the HUD OIG's letter. However, the relevant regulation and the letter make it clear that the date of the letter, not its receipt, triggered the time for filing an appeal.

Both parties rely on *Oglesby* to support their opposing positions, but *Oglesby* addressed whether a FOIA requester could skip the administrative appeal and go straight to court when the agency's response to the FOIA request was late, but was received before the requester filed his lawsuit. *Oglesby* held that, even though the agency responded late, "an administrative appeal is mandatory if the agency cures its failure to respond within the statutory period by responding to the FOIA request before suit is filed." 920 F.2d at 63. The Court gave the appellant additional time to file an administrative appeal, because the requirements for exhaustion of administrative remedies had been unclear. *See id.* at 71. However, the D.C. Circuit firmly stated that "in future cases foregoing an administrative appeal will preclude the requester from ever bringing suit on that request because the individual will not have exhausted his administrative remedies." *Id.* at 65. In this case, plaintiff was aware that it was required to file an administrative appeal but did not do so in a timely fashion. Plaintiff's argument that a late-filed appeal is distinguishable from wholesale failure to appeal is unpersuasive.

Losing the right to judicial review because a filing deadline is missed by one day may seem unduly harsh, but short of exceptional circumstances (which are not present here), courts have generally respected statutory and regulatory deadlines. For example, in *U.S. v. Locke*, 471 U.S. 84, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), appellees filed one day later than required by Bureau of Land Management regulations and lost all claim to land and mineral deposits. Just as Hamilton argued that it has complied with the FOIA appeal filing requirement by filing within 30 days of receipt of the denial of its FOIA request, appellees in *Locke* argued that they substantially complied by filing one day late. *See id.* at 100, 105 S.Ct. 1785. The Supreme Court rejected the argument.

> "The notion that a filing deadline can be complied with by filing sometime after the deadline falls due is, to say the least, a surprising notion, and it is a notion without limiting principle. If 1–day late filings are acceptable, 10–day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule erected by the filing deadline; yet regardless of where the cutoff line is set, some individuals will always fall just on the other side of it. Filing deadlines, like statutes of limitations, necessarily operate harshly and arbitrarily with respect to individuals who fall just on the other side of them, but if the concept of a filing deadline is to have any content, the deadline must be enforced ... A filing deadline cannot be complied with, substantially or otherwise, by filing late—even by one day."

*Id.* at 100–01, 105 S.Ct. 1785. Likewise, in the context of administrative appeals, federal courts have strictly enforced filing

deadlines. *See., e.g., Virgin Islands Tel. Corp. v. Federal Communications Comm'n,* 989 F.2d 1231 (D.C.Cir.1993) (upholding FCC's refusal to entertain petition for reconsideration when petition was filed one day late and extenuating circumstances did not prohibit petitioner from filing within prescribed time limits); *O'Neill v. Heckler,* 579 F.Supp. 979 (E.D.Pa.1984) (denying judicial review of denial of social security disability payments when claimant filed one day late).

Hamilton filed late, thereby foregoing its right to administrative appeal. Because it failed to properly exhaust its administrative remedies, it has no statutory right to sue. According to the D.C. Circuit, "a cause of action under FOIA first accrues when the requester first exhausts his remedies." *Spannaus v. U.S. Dep't of Justice,* 824 F.2d 52, 59 (D.C.Cir.1987) (noting that the statutory right to sue is suspended during the period in which administrative review is available or "entirely cut off (if the requester never appeals the denial)"). The Court therefore grants Defendant's Motion to Dismiss for lack of subject matter jurisdiction.

## II. MOTION FOR SUMMARY JUDGMENT

While this Court is persuaded by defendant's arguments regarding lack of subject matter jurisdiction, it will, as did the IG, proceed to consider the merits of defendant's claim of exemption from FOIA's disclosure requirements. This Court must conduct a de novo review of the HUD OIG's decision to withhold the draft audit report, *see* 5 U.S.C. § 552(a)(4)(B), and will grant summary judgment if there are no genuine issues of material fact. *See* Fed.R.Civ.P. 56(c). Hamilton contends that "genuine issues of material fact exist regarding (a) the applicability of FOIA Exemptions 5 and 7(A) to the facts of this case; (b) whether the OIG made a good faith effort to segregate and produce non-exempt materials responsive to the FOIA request; and (c) the agency's bad faith

handling of this FOIA request and the bad faith evident in its termination of the underlying audit and investigation of the loan sales program." Opposition at 1.

In determining whether genuine issues of material fact exist, this Court may rely on "agency affidavits ... if the affidavits describe the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C.Cir.1981).

### A. *Exemption 5*

■ The HUD OIG claims that the draft audit is protected under the deliberative process privilege of Exemption 5 of the FOIA, which permits nondisclosure of "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). In order for Exemption 5 to apply, the materials must be both predecisional and deliberative. *See Tax Analysts v. I.R.S.,* 117 F.3d 607, 616 (D.C.Cir.1997).

The OIG claims the report is predecisional because it was suspended and never completed. According to paragraph 5 of the Declaration of Kathryn Kuhl–Inclan, Assistant Inspector General for Audit, the draft consists of "recommendations prepared by staff auditors and/or intermediate-level supervisory staff [which] were in effect recommendations to the District Inspector General concerning what OIG's official findings and recommendations should be." The District IG did not, however, sign off on or otherwise approve of the incomplete audit, and therefore, defendant claims that the draft is predecisional.

In response, Hamilton argues that the audit documents "are not pre-decisional simply because they are generated early in the audit period." Opposition at 7 (citing

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 869 (D.C.Cir.1980)). Hamilton further claims that the audit was not related to the adoption of an identifiable government policy. *Id.* Rather, Hamilton asserts that the Denver audit constituted "a review and evaluation of a policy already enacted." Opposition at 10.

▮ Courts are reluctant to force agencies to expose their decisionmaking processes. *See, e.g., NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151–152, 95 S.Ct. 1504, 44 L.Ed.2d 29 (1975) (noting that courts draw a line between "predecisional communications, which are privileged, and communications made after the decision and designed to explain it"). The Supreme Court observed that "agencies, are, and properly should be, engaged in a continuing process of examining their policies; this process will generate memoranda containing recommendations which do not ripen into agency decisions; and the lower courts should be wary of interfering with this process." *Id.* at 153 n. 18, 95 S.Ct. 1504. Thus, even if the draft audit itself did not lead to the adoption of a specific government policy, its protection under Exemption 5 is not foreclosed, as long as the document was generated as part of a definable decision-making process. *See Petroleum Information Corp. v. U.S. Dep't of the Interior*, 976 F.2d 1429, 1434 (D.C.Cir.1992). The Supreme Court explained in *NLRB*, "Our emphasis on the need to protect pre-*decisional* documents does not mean that the existence of the privilege turns on the ability of an agency to identify a specific decision in connection with which a memorandum is prepared." *Id.* (emphasis in the original).

Whether the draft audit qualifies as predecisional depends upon its role in the HUD OIG's audit process. *See, e.g., id.* at 155, 95 S.Ct. 1504 (finding that General Counsel's recommendation to file a case is protected by Exemption 5 because it must be reviewed by the Regional Director who decides whether to file or drop a case). The HUD OIG describes a three-tiered process of audit production and review: first, staff auditors prepare findings and recommendations; then, an intermediate-level supervisor reviews the draft findings and recommendations; and finally, the District Inspector General reviews the draft and decides what the OIG's official findings and recommendations should be. *See Office of Inspector General Manual,* Chapter 2120, June 1993 ("OIGM"). The *OIGM* describes the development and presentation of audit findings and recommendations, including development of draft findings, auditee comments, supervisory review, more auditee comments, and final review and recommendations. *See OIGM* at i-ii. Auditors "should report recommendations when the potential for *significant* improvement in operations and performance is substantiated by the reported findings." General Accounting Office, *Government Auditing Standards* at 92 (1994) (emphasis in the original).

The draft audit at issue here had not progressed beyond intermediate-level supervisory reviews, and according to the Supplemental Declaration of Kuhl–Inclan, the "drafts contained recommendations to the Federal Housing Commissioner–Assistant Secretary for Housing concerning policies or procedures to improve program operations." While Hamilton is correct in arguing that, based on *Coastal States v. Dep't of Energy*, early generation in the audit process does not necessarily render the documents pre-decisional, the Court in *Coastal* also noted that "the deliberative process privilege is … dependent upon the individual document and the role it plays in the administrative process." 617 F.2d at 867. The *Coastal* documents were significantly different from the draft audit report at issue here. In *Coastal*, regional counsel had supplied interpretations of regulations to auditors, who sought guidance in the course of performing an audit. *Id.* at 858, The D.C. Circuit found that "these opinions were routinely used by agency staff for guidance in conducting their audits, and were retained and re-

ferred to as precedent" and were "simply straightforward explanations of agency regulations in specific factual settings." *Id.* at 868. There was no automatic review of the counsel opinions, which "in practice represent interpretations of established policy on which the agency relies in discharging its regulatory responsibilities." *Id.* at 868; *see also Tax Analysts v. IRS,* 117 F.3d 607, 617 (D.C.Cir.1997) (finding field service advice memoranda not predecisional because they were "statements of an agency's legal position").

As demonstrated by the two Kuhl–Inclan declarations, the draft audit report at issue here had a very different role in the administrative process from that of the *Coastal* documents. *See OIGM* at i-ii. Unlike the *Coastal* documents, the draft audit report had no precedential impact, would automatically have been reviewed at least twice, and was in no sense "a body of secret law" which the HUD OIG uses in dealing with the public. 617 F.2d at 868. The draft audit report is analogous to the Regional Board recommendations protected under the deliberative process privilege in *Renegotiation Board v. Grumman Aircraft Eng. Corp.,* 421 U.S. 168, 95 S.Ct. 1491, 44 L.Ed.2d 57 (1975). In *Grumman,* the Supreme Court considered the process of renegotiating excessive contractor profits and found that the Regional Boards could investigate and recommend, but only the Board itself could decide. *Id.* at 183, 95 S.Ct. 1491. Here, as in *Grumman,* the auditor's work had no "real operative effect independent of 'review.'" *Id.* at 186, 95 S.Ct. 1491. The Supreme Court found that the Regional Board's "recommendation is functionally indistinguishable from the recommendation of any agency staff member whose judgment has earned the respect of a decisionmaker." *Id.* at 187, 95 S.Ct. 1491. Likewise, the draft audit report is the recommendation of agency staff members "whose judgment has earned the respect of a decisionmaker." *Id.* Thus, it satisfies the first prong of the deliberative process privilege.

In order to qualify for protection under Exemption 5, the draft audit report must also satisfy the second prong of the deliberative process privilege, which requires that the report be deliberative in nature. HUD claims that, under *Coastal,* the draft audit is deliberative solely because it is a draft, since drafts "reflect the personal opinions of the writer rather than the policy of the agency." Motion to Dismiss at 12. In short, "the very process by which a draft evolves into a final document constitutes a deliberative process." *Id.* at 13. Hamilton contends that the HUD OIG "seriously misstates the law, for the *Coastal* case does not state that drafts are privileged *'because'* they reflect the personal opinions of the writer, but rather states that drafts *'which'* reflect the personal opinions of the writer, rather than the policy of the agency, may be subject to the privilege...." Opposition at 9–10.

As explained by the D.C. Circuit, the second prong focuses on "whether disclosure of the requested material would tend to 'discourage candid discussion within an agency.'" *Petroleum Info. Corp. v. U.S. Dep't of Interior,* 976 F.2d 1429, 1434 (D.C.Cir.1992) (quoting *Access Reports v. Dep't of Justice,* 926 F.2d 1192, 1195 (D.C.Cir.1991)). A "deliberative" document reflects the "give and take" of the deliberative process and contain "opinions, recommendations, or advice about agency policies." *Arthur Andersen & Co. v. IRS,* 679 F.2d 254, 257 (D.C.Cir.1982). To understand the import of *Coastal* for draft documents, one cannot parse the language of the decision as plaintiff attempts to do here. *Coastal* held that Exemption 5 "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinion of the writer rather than the policy of the agency." 617 F.2d at 866. Applying the doctrine of *ejusdem generis* to the language used in *Coastal,* a draft document is the type of subjective document that reflects the personal opinion of the writer rather than the policy of the agen-

cy. Contrary to plaintiff's assertion, *Coastal* supports the application of Exemption 5 to drafts such as the one at issue here: "Documents which are protected by the privilege are those which would inaccurately reflect or prematurely disclose the views of the agency, suggesting as agency position that which is as yet only a personal position." *Id.* The draft audit report was not reviewed by the District Inspector General, and only those materials that are reviewed and approved by the District Inspector General represent the agency's final position. *See OIGM* at i-ii.

Hamilton further argues that the draft audit is not deliberative in nature because it was conducted in the routine course of business. Documents containing information from publicly available sources or which serve a primarily technical or facilitative purpose are generally not protected under Exemption 5. *See Petroleum,* 976 F.2d 1429 (D.C.Cir.1992). In *Petroleum,* plaintiff sought access to records from a computer data bank containing information on lands and minerals within the Bureau of Land Management's jurisdiction that were gathered from publicly available sources. *Id.* at 1436. The file was not protected from disclosure by the deliberative process privilege because the information in the file came exclusively from publicly available documents, the file reflected few discretionary judgments, and the file was not related to a "significant *policy* decision." *Id.* at 1437. The Court found that the purpose of creating the computer file was "essentially technical and facilitative." *Id.*

Unlike the data requested in *Petroleum,* however, the information in the draft audit report does not come from publicly available sources. According to the Review of Denver's Mortgage Loan Sales Working Papers by Senior Auditor David J. Niemiec, the draft audit report is based in part on interviews and is a synthesis of the contents of working files which contain summary working papers, comments of the auditor-in-charge, and responses of the auditors to the comments. Niemiec memo, Att. 1–2. The draft audit report does not merely involve the collection and compilation of publicly available data. It involves judgments about what to collect, how to collect it, and how to present it. Moreover, unlike the collection of data in *Petroleum,* the purpose of auditing the loans sales reform program was neither technical nor facilitative. Instead, it was to evaluate the program so that the OIG could recommend appropriate measures to improve it: "our recommendations are the primary basis for obtaining corrective action after the report is issued." *See OIGM* at 21. In *Petroleum,* the Court found that the "technical, objective tenor of the [computer files] also reduces the likelihood that disclosure would result in public criticism of individual BLM employees." 976 F.2d at 1438. Here, on the other hand, if front-line auditors believed that their observations and conclusions during an audit would be made public, their willingness to be candid could well be inhibited.

■ Based on the above authorities, this Court finds that the draft audit report is protected from disclosure by Exemption 5 of the FOIA because it is both predecisional and deliberative, and disclosure of the draft audit report would threaten the integrity of the agency's policymaking processes.[1]

## B. *Segregation Claim*

The FOIA regulations require that "Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of portions which are exempt under this subsection." 5 U.S.C. § 552(b). Hamilton argues that

---

1. Given the Court's conclusion that the draft audit is protected from disclosure under Exemption 5, it need not address the applicability of the investigatory files privilege under Exemption 7(A). *See McCutchen v. United States Dep't of Health and Human Services,* 30 F.3d 183 (D.C.Cir.1994) (noting that if information is protected by one FOIA exemption, the court need not consider whether another exemption also protects that information.)

"there is scant reason to believe the Inspector General's assertion that *any* portions of the requested reports fall within a FOIA exemption, let alone that significant portions could not be segregated and produced." Opposition at 17. In response, the HUD OIG has submitted a Supplemental Declaration from Kathryn Kuhl–Inclan, Assistant Inspector General For Audit, stating that because "they are drafts in their entirety, there is nothing in the drafts of the audit report that can reasonably be segregated and released."

 Since no portion of the draft audit report was reviewed by the District Inspector General, no portion is reasonably segregable for production. The District Inspector General did not sign off on any part of the draft report. The affidavit submitted by the HUD OIG indicates that "there is an obvious inconsistency between what Denver was to have done and what Denver was reporting as being done" and that conclusions drawn in the draft audit report differ from conclusions drawn elsewhere in the financial audit. Niemiec memo at 3. Although purely factual material that is segregable from opinion material is generally not protected, even factual material may come within the Exemption 5 if the "manner of selecting or presenting those facts would reveal the deliberative process, or if the facts are inextricably intertwined with the policymaking process." *Ryan v. Dep't of Justice*, 617 F.2d 781, 790 (D.C.Cir.1980) (citations omitted). "To the extent that predecisional materials, even if 'factual' in form, reflect an agency's preliminary positions or ruminations about how to exercise discretion on some policy matter, they are protected under Exemption 5." *Petroleum*, 976 F.2d at 1434 (D.C.Cir.1992). Here, any factual information that could be excised would reveal decisions made by the auditor who prepared the draft report, which could have been rejected, accepted or reconciled by senior levels of review if the draft audit report had progressed through the established agency review process. If decisions made by the auditor, even decisions to gather or report factual data, were to be exposed to public view, it would certainly chill further agency deliberations. Thus, no portion is reasonably segregable, and the entire document is protected by the deliberative process privilege.

## C. *Bad Faith Claims*

 Hamilton claims that the "Inspector General's handling of Hamilton's FOIA request evidences bad faith and warrants denial of her motions to dismiss and for summary judgment, and also justifies Hamilton's request for discovery and review of the documents in question by the Court." Opposition at 17. Hamilton also claims that the HUD OIG acted in bad faith in terminating the audit. *Id.* at 19. Bad faith on the part of the agency would be sufficient to defeat the motion for summary judgment. *See, e.g., Carter v. U.S. Dep't of Commerce*, 830 F.2d 388, 393 (D.C.Cir.1987) (noting that summary judgment is inappropriate when "there is evidence of agency bad faith—for example, if information contained in agency affidavits is contradicted by other evidence in the record.") However, this Court finds no evidence to support Hamilton's allegations of bad faith.

First, Hamilton says that the OIG acted in bad faith when it limited Hamilton's request to a portion of the audit materials and failed to inform Hamilton that it was so limiting the request. Opposition at 17. This characterization of Hamilton's FOIA request and HUD OIG's response is simply wrong. The record shows that Hamilton submitted a vague and poorly worded request. *See* Letter from M. McManus to J. Hetherton. Faced with such a request, an agency may construe the request as it reasonably sees fit, as long as it informs the requester of the defined scope of the request. *See Dettmann v. U.S. Dep't of Justice*, 802 F.2d at 1476. The HUD FOIA officer explicitly responded that the HUD OIG was construing the request to be for "a copy of the draft audit report."

Letter from D. Hall to M. McManus. Thus, there can be no claim of bad faith.

Second, Hamilton alleges that the HUD OIG acted in bad faith by failing to make any effort to segregate non-exempt material. *See* Opposition at 17. The HUD OIG, however, did submit a supplemental declaration from the Assistant Inspector General For Audit stating that because "they are drafts in their entirety, there is nothing in the drafts of the audit report that can reasonably be segregated and released." Supplemental Declaration of Kathryn Kuhl–Inclan at 2. The HUD OIG, therefore, did consider the possibility of segregating material and found that the draft audit report was protected in its entirety. The Court finds no evidence of bad faith relating to the issue of segregability.

Third, Hamilton alleges that the HUD OIG acted in bad faith by relying on "declarations that are clearly contradicted by evidence on the Record." Opposition at 17–18. The declaration in question, cited by Hamilton, is that of the Assistant Inspector General Kuhl–Inclan who attested that the audit reviewed both loan sales and credit reform. *Id.* at 18. Hamilton contends that the evidence in the record shows that by construing its FOIA request to be for the draft audit report of the loan sales program, the FOIA officer concealed the fact that there was a draft audit report of the credit reform program, since Hamilton had no way of knowing that the audit had proceeded on two tracks at the time of its request. *Id.* This allegation seems to stem largely from confusion over the way the HUD OIG uses the term "loan sales." In fact, the entire audit was of mortgage loan sales, but the working papers broke down into four major categories: a survey, the credit reform program as it relates to mortgage sales, a review of multifamily sales, and a review of single family sales. Niemiec memo, att. 1. The only draft audit report prepared was of the credit reform aspect of the mortgage sales program, *id.* at 6, and that is the draft audit report at issue in this case. The FOIA officer construed Hamilton's request to be for the only draft audit report that exists in all of the working papers from the Denver audit. No separate draft report exists. This Court therefore finds no bad faith in the HUD OIG's reliance on the Kuhl–Inclan declaration.

Fourth, Hamilton alleges that the HUD OIG acted in bad faith by trying to "disrupt communications between Hamilton's counsel and a witness adverse to the government." Opposition at 18. The HUD OIG wrote Hamilton's attorney after reading the affidavit of Cindy L. Ecker, a former OIG employee who worked on the audit and testified in a deposition that the audit was favorable to the loan sales program. *See* Letter to M. McManus from B. Saddler. The HUD OIG requested that Hamilton withdraw the affidavit, since it had not been authorized by the IG. *Id.* The affidavit was never withdrawn and remains part of the record of this case. *See* Affidavit of Cindy L. Ecker. Hamilton further alleges that the "Inspector General has taken steps to intimidate" Ecker "to prevent her from providing additional information to Hamilton," (Opposition at 19), but provides no evidence of any intimidation. Without more, this Court finds no bad faith on the part of the OIG in objecting to the Ecker affidavit, especially in view of the OIG's reliance on 24 C.F.R. § 2004.3(b), which states:

> Without *prior* approval of the Inspector General, no employee or *former employee* of the Office of Inspector General shall in response to demand of a court or other authority … disclose any information … acquired as part of the performance of official duties or because of official status. (emphasis in original.)

Fifth, Hamilton claims that the HUD OIG acted in bad faith by terminating the audit as part of a pattern of questionable conduct relating to the loan sales investigation. *Id.* at 20. Hamilton sent a letter to the Federal Bureau of Investigation in order to report the alleged improper motives and actions of the HUD OIG and

sent copies to two congressmen and other senior government officials. *See* Letter from T. Pickard to M. McManus. As a result, on June 1, 1999, the President's Council on Integrity & Efficiency wrote Hamilton that it was reviewing the matter. *See* Letter from T. Pickard to M. Mc-Manus. The results of this review are unknown, and again, without more, this Court has no basis upon which to accept the claim that termination of the audit warrants a finding of bad faith.

### *CONCLUSION*

For the reasons stated above, the Court will grant defendant's Motion to Dismiss on the grounds that this Court lacks subject matter jurisdiction and defendant's Motion for Summary Judgment on the grounds that the draft audit report is protected from disclosure under FOIA by the deliberative process exemption, 5 U.S.C. § 552(b)(5). The Court also denies plaintiff's Motion for Discovery and In Camera Review.

### *ORDER*

This case having come before this Court on Defendant's Motion to Dismiss and for Summary Judgment, and Plaintiff's Motion for Discovery and In Camera Review, upon consideration of the entire record herein, for the reasons stated in the accompanying memorandum opinion, it is hereby

**ORDERED** that:

(1) Defendant's Motion to Dismiss on the grounds that this Court lacks subject matter jurisdiction is **GRANTED.**

(2) Defendant's Motion for Summary Judgment on the grounds that the draft audit report is protected from disclosure under FOIA by the deliberative process exemption, 5 U.S.C. § 552(b)(5), is **GRANTED.**

(3) Plaintiff's Motion for Discovery and In Camera Review is **DENIED.**

**SO ORDERED.**